UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 2:12-CR-551 |
| | § | |
| MICHAEL YARBROUGH, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER ON MOTIONS TO SUPPRESS

Before the Court are the Defendants' Motions to Suppress (D.E. 73, 81, 82) and the Government's Response (D.E. 92) along with the briefing of the parties (D.E. 116, 117). At issue in this case is whether evidence gained at 4101 Up River Road, Corpus Christi, Texas (Yarbrough House) was obtained in violation of the Fourth Amendment prohibition against unreasonable searches and seizures. More particularly, the question is whether government agents overstepped their bounds in effectuating an arrest of Elias Puebla at the residence, which allegedly breached the privacy rights of the Yarbroughs, who were tenants and not directly involved in the arrest. For the reasons set out below, the Motions are DENIED.

## FACTS

Elias Puebla (Puebla) was considered a "violent offender," on a six-year probationary term for robbery and assault with a deadly weapon. As part of his community supervision, Puebla was prohibited from being in possession of firearms. Despite that prohibition, on August 13, 2011, a probation officer spotted Puebla at a gun show with a rifle slung across his back, carrying what was believed to be a bag of

1 / 16

ammunition. Officers took the photographic and video proof of Puebla's gun show appearance to a state judge and obtained an arrest warrant on August 15, 2011. They then called on the Gulf Coast Violent Offenders Task Force, an inter-agency cooperation of the Corpus Christi Police Department (CCPD) and the United States Marshal Service, to execute the arrest warrant.

### A. Determination that Puebla Resided at the Yarbrough House and Entry into the Backyard.

Kimberly Soliz, Puebla's Community Supervision Officer (CSO), accompanied task force leaders Don Snider (Deputy of the Marshal Service) and Heleodoro Cantu (CCPD Officer) to the last address that Puebla had supplied to Officer Soliz as his residence: 640 State Highway 77, Apartment #1821, Robstown, Texas (Robstown Apartment). Elias Puebla's sister, Diamond, lives at the Robstown Apartment with her husband, James Garza. According to Deputy Snider and Officers Soliz and Cantu (interviewing delegation), when they inquired as to Puebla's whereabouts, Diamond reported that Puebla had not been there since three days prior.

Garza stated that Puebla was not welcome in their home and that he might be found at his mother's trailer or living at the Yarbrough House with his friend, Michael.[1] The members of the interviewing delegation all testified that they left that conversation with the firm understanding that Puebla was residing at the Yarbrough House.[2]

---

[1] Michael Yarbrough was renting the house from his father, Philip Daniel Yarbrough.

[2] Officer Cantu was cross-examined on his incident report, which listed the Robstown Apartment as Puebla's address. Officer Cantu credibly responded that the computer program has an automatic insert function for the offender's address and he did not manually update it, despite his knowledge that Puebla resided at the Yarbrough House. He pointed out that the narrative portion of his report recites the Yarbrough House as Puebla's residence.

According to another member of the task force, Deputy Collins (U.S. Marshal Service), when the interviewing delegation briefed the rest of the task force, the clear conclusion was that, as a result of the conversation with the Robstown Apartment residents, Puebla was living at the Yarbrough House.

Officer Soliz was familiar with the Yarbrough House. Puebla had previously reported that address as his residence for a time period in late May and June, 2011. After a CSO home visit in mid-June, Puebla was instructed to find a new residence because the Yarbrough House contained firearms that Puebla was not permitted to be near. It was at that point that Puebla began listing the Robstown Apartment, an address that he had used before, as his new residence address. Deputy Snider and Officer Soliz both testified that probationers often supply erroneous residence addresses (such as the Robstown Apartment) so that they appear to be in compliance with the requirements of their probation when they are not.[3] After interviewing Diamond and James Garza, the officers reasonably believed that the Yarbrough House was still Puebla's actual residence.

This belief was reinforced when, in their initial pass by the Yarbrough House, CSO Soliz spotted a red Sebring vehicle parked in the yard. She was aware of that car as being owned by Michael Yarbrough, but driven by Puebla because she had seen Puebla drive it in the past. As the officers began surveillance to determine whether the arrest warrant could be safely executed in that neighborhood, Officer Soliz explained to the task force what she already knew of the layout of the Yarbrough House. While they donned

---

[3] Officer Soliz testified that she and Special Agent Garner had gone to the Robstown Apartment looking for Puebla in June, 2011, when he previously reported it as his residence. On that occasion, his sister, Diamond, told them that he occasionally slept on the couch there, but was not living with them. Brother-in-law Garza had also previously said that he did not want Puebla living there. Special Agent Garner corroborated this.

3 / 16

bullet-proof vests, a vehicle arrived with two women who appeared to be bringing bags of fast food to the house. One of the women was Julia Puebla, Elias Puebla's younger sister. The officers approached Julia and she confirmed that Puebla was in the house.

Engaging standard operating procedure for effectuating an arrest, the officers split up to cover the entrances and exits of the home. Three officers pushed open an unlocked gate that was slightly ajar on the backyard privacy fence to cover the back door while Deputy Snider, Officer Cantu, Officer Soliz and Corpus Christi Police Department Officer Harmon approached the front door.

### B. Exigent Circumstances Justifying Entry into the Home to Perform a Protective Sweep.

Each of the testifying officers who approached the front door testified that, as they got closer, they heard the distinct sound of more than one rifle being racked, charged, or loaded. Deputy Snider testified as to the distinct metal-on-metal sound made by guns in action from his military and law enforcement background. Each of the witnesses testified credibly about the sounds they heard and the danger those sounds indicated to them.

The sounds heard and the effect they had is corroborated by the fact that there were at least four surveillance cameras aimed at the front door, indicating that the occupants knew who was outside. While Ashley Yarbrough testified that the monitor for the cameras was black at the time, she did admit that Michael Yarbrough announced, "Elias' probation officer is here."

Upon hearing the sounds of loading guns, Deputy Snider immediately told his team to back up and find cover and he tried to radio this warning to the three officers who

had gone to the backyard.  When radio communication was not confirmed, Deputy Snider ran to the back yelling warnings to the effect of "they're loading guns!"  Deputy Collins testified that Deputy Snider was yelling in a "focused and intentional" manner, confirming the urgency of the situation.  Officer Soliz testified that she thought, "Oh my God, they're going to shoot!"  She took Julia and her friend to the far side of a vehicle to take cover.  As Deputy Snider rounded the back of the house, he heard and saw that the three officers were already in the process of taking Puebla into custody and detaining Michael Yarbrough and another man.

     Their presence known, expecting a firefight, and with the risk of being shot in the back if they just left with Puebla, the officers called for emergency backup and ordered everyone out of the house.  Calling for emergency backup is not taken lightly and is not done often.  Deputies Snider and Collins both testified that it was the first time they had called in backup on a violent offender task force operation.  Another six to eight people exited the house and the officers quickly saw that they were vulnerable and outnumbered, but the emergency response was fast.

     The officers tried to ascertain from those exiting the house whether there were additional individuals inside the home, but they could not get a solid representation one way or another.  Deputy Snider moved into the kitchen to call remaining people out.  A man and two women finally emerged, several minutes after their initial refusal to exit.  According to Deputy Collins, they were sure they had stumbled onto something illegal and very dangerous.

The agents and officers then entered the Yarbrough House to do a protective sweep. A protective sweep is a procedure used to protect the officers, the people involved, and the surrounding community from the risk of armed persons remaining in hiding who could open fire. They looked for people and people-sized hiding places, moving only beds and dressers to determine if there were more people in the house. The protective sweep was concluded without discovering any additional individuals.

However, during the protective sweep, the officers observed large quantities of firearms and firearm parts, along with the means of manufacturing firearms throughout the house in plain view. In the kitchen, there were two full and open duffle bags, one containing gun ammunition magazines and another containing ammunition bandoliers. Further inside, there was a firearm on a table next to a recliner and an open duffle bag of fully-assembled AK-47-type rifles. There were also rifles out in the open next to the stairway and at least five firearms strewn on the bed in the master bedroom.

The officers saw chemicals, both in open tubs and in closed containers, along with other known bomb precursors such as salt and pipes. So they called the Bureau of Alcohol, Tobacco, and Firearms (ATF) and the local Bomb Squad to come to the house and assist with a scene, the likes of which they had never before seen and the hazards of which they could not fully assess without additional expertise.

The Bomb Squad officer, whose only task at the time was to look for biohazards and explosives and "assess and diffuse," walked through the house without disturbing the contents and determined that there was no imminent threat from fumes, leaking chemicals, or other close-proximity liquids. The ATF Agent, Special Agent Garner,

walked through the house to determine whether the large quantities of firearms, manufacturing equipment, and materials constituted probable cause for a search warrant for federal firearm violations. He testified that he had never before seen such a scene.

### C. Defendants' Actions During the Wait for a Search Warrant.

During questioning, but before any search warrant was obtained, Michael Yarbrough and Ashley Yarbrough, who had been *Mirandized*, both volunteered to the officers that they were not doing anything illegal because they were not assembling complete weapons. They said the firearms were not more than 80% assembled and were being sold at gun shows as kits for $600. When asked about a duffle bag full of fully-assembled AK-47s, they both responded that those were "for us," meaning for their personal use. There were approximately 30 fully-assembled rifles.

While Ashley Yarbrough testified that she had not been *Mirandized,* Special Agent Steve Waters testified credibly that he had read her her rights (D.E. 113, pp. 155, 196, 201, 206) and that she indicated that she understood them (D.E. 113, p. 157). Officer Robert Richey testified credibly that he had been present when Special Agent Waters read her her rights and obtained her acknowledgement that she understood them. D.E. 113, pp. 310-11. When cross-examined on his report, which fails to recite that Ashley Yarbrough was *Mirandized*, Agent Waters testified credibly that it was an oversight with respect to the report and that she had, in fact, been *Mirandized*. D.E. 113, pp. 196, 201, 206.

Michael Yarbrough indicated to Special Agent Garner that he wanted to cooperate and invited the ATF Agents into the house, saying "Let me show you." But once inside,

when Special Agent Garner asked for consent to search, Yarbrough decided he did not want them to search. Immediately, they all exited the house and awaited the search warrant.

Finding that there was probable cause to believe that a crime was being committed in the Yarbrough House, Special Agent Garner prepared an affidavit and obtained a search warrant from a federal Magistrate Judge. Every government witness testified that, before the search warrant was obtained, nothing else but a protective sweep and emergency assessment of the scene for public safety was conducted. Nothing was disturbed other than checking "people-sized hiding places" to determine if anyone was still hiding in the house. The search warrant was obtained at 2:41 a.m. on August 16, 2011 and the search started at 3:15 a.m.

### D. Essential Findings.

In sum, the Court finds the following:

1. Elias Puebla was residing at the Yarbrough House when the arrest warrant was executed;

2. The agents and officers reasonably believed that Puebla was residing at the Yarbrough House and was actually inside at the time they executed the arrest warrant;

3. The agents and officers acted reasonably in passing through the privacy fence gate to cover the back door of the house in order to apprehend Puebla pursuant to the arrest warrant;

4. When the agents and officers entered the house to conduct their protective sweep, they reasonably believed that they were in imminent danger from the sounds they heard coming from inside the house and the number of individuals who had been inside the house;

5. The agents and officers acted reasonably in entering the Yarbrough House to conduct a protective sweep;

6. The Yarbrough House was filled with sufficient numbers of firearms and chemicals in plain view during the protective sweep to justify the detention of individuals and the obtaining of a search warrant; and

7. Law enforcement officers advised Ashley Yarbrough of her *Miranda* rights before interrogating her and did not use coercive means to elicit information from her.

## DISCUSSION

Defendants have asserted three bases for their Motions to Suppress: (1) law enforcement officers violated the Fourth Amendment when they breached the curtilage of their residence; (2) law enforcement officers violated the Fourth Amendment when they entered the home after the protective sweep to gain information to support a search warrant for firearms violations; and (3) law enforcement officers violated Ashley Yarbrough's Fifth Amendment rights by interrogating her without first reading her *Miranda* rights and after subjecting her to a long and arduous detention. D.E. 81, 82, 116. As a result, Defendants seek to suppress all evidence, arguing that it was all obtained under the "fruit of the poisonous tree" principle.

### A. The Breach of the Curtilage of the Home Was Lawful.

The Court agrees that, when the agents and officers pushed open the gate to the backyard privacy fence, they were entering the curtilage of the home. *E.g.*, *United States v. Dunn*, 480 U.S. 294, 301, 107 S.Ct. 1134 (1987). Defendants cite *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642 (1981) for the proposition that officers cannot enter a third party's home to effectuate an arrest without a search warrant, a resident's consent, or exigent circumstances. At the time that the officers first walked through the gated

backyard to cover the rear exit, they had an arrest warrant, but did not have a search warrant, consent, or exigent circumstances.

There is no question that officers can enter a fugitive's residence without a search warrant when executing an arrest warrant. *Payton v. New York*, 445 U.S. 573, 603 (1980). However, the officers cannot enter a third party's residence for the same purpose. *Steagald*, *supra*. So the question for the Court is whether the Yarbrough House was Puebla's residence. As noted above, the Court finds that the evidence established that Puebla was residing at the Yarbrough House when the arrest warrant was executed.

Additionally, the officers had an objectively reasonable belief that the Yarbrough House was Puebla's residence and that he was within, sufficient to permit entry on the basis of the arrest warrant. A reasonable belief that the house is the fugitive's residence is sufficient. *United States v. Barrera*, 464 F.3d 496, 504 (5th Cir. 2006).

In *Barrera*, the officers' objectively reasonable belief was supported by evidence that the fugitive had been arrested at that home previously, the home had been listed as a residence in official documents, and the fugitive's vehicle was parked outside the home when the officers arrived to execute the arrest warrant. *Id.* at 504. The same kind of circumstances exist here, where Puebla had previously resided at the Yarbrough House, he had listed it on his probation check-in sheet, his sister and brother-in-law identified it as the place he was living, and the car he was using was parked outside when law enforcement arrived, with another sister delivering food and confirming that Puebla was in the house.

The evidence supports the finding that Puebla was residing at the Yarbrough House at the time the arrest warrant was executed there and that the law enforcement officers reasonably believed that to be the case. Consequently, the breach of the curtilage prior to the development of exigent circumstances was a lawful exercise in the execution of the arrest warrant and the Motions to Suppress on this basis are DENIED. The immediately following exigent circumstances further justified entry into the home and the protective sweep, both of which actions are left unchallenged in Defendants' briefing.

### B. The Additional Inspection of the Scene Was Lawful

Defendants next complain of the "continued warrantless search" after the protective sweep and after the premises were secured. This complaint is focused on ATF Special Agent Garner being called in and given access to the premises in order to determine if there was probable cause to believe that firearm violations were in progress at the home—the basis of the search warrant. While Defendants state their complaint, they do not provide any authority for the proposition that it is a Fourth Amendment violation for additional officers to view the scene prior to obtaining a search warrant. There was no evidence that Special Agent Garner saw anything that the other officers had not already seen.

The Government relies on two arguments: (1) the exigent circumstances justified the continued access to the home; and (2) Defendants did not suffer any prejudice to their defense from this additional pre-search inspection. The Court agrees. The Fifth Circuit has explained the determination of exigent circumstances as follows:

> Because it is essentially a factual determination, there is no set formula for determining when exigent circumstances may justify a warrantless entry. ***Exigent circumstances generally exist where there is a risk that the officers or innocent bystanders will be endangered, or that evidence will be destroyed.*** In *Rico*, we identified a non-exhaustive list of factors that may be considered in determining whether exigent circumstances existed:
>
> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant;
>
> (2) the reasonable belief that contraband is about to be removed;
>
> (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought;
>
> (4) information indicating that the possessors of the contraband are aware that the police are on their trail; and
>
> (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic.

*U.S. v. Blount*, 123 F.3d 831, 837-38 (5th Cir. 1997) (*en banc*; emphasis added) (citing *United States v. Rico*, 51 F.3d 495, 501 (5th Cir.), *cert. denied*, 516 U.S. 883, 116 S.Ct. 220, 133 L.Ed.2d 150 (1995) and *United States v. Richard*, 994 F.2d 244, 247 (5th Cir. 1993)).

Applying these principles to this firearm case, the Court concludes that exigent circumstances continued to exist from the time the agents and officers heard the sound of guns being racked through the time the search warrant was obtained. The quantity of people and firearms, as well as the chemicals and other explosive precursors justified the entry of ATF agents for purposes of inspecting the premises for danger and indications of

criminal activity. Defendants did not supply any authority on which to base a conclusion that the exigent circumstances had come to rest and no further danger was present. And the facts in this case would not support such a conclusion.

The Court finds that the ATF agents' entry and inspection was no greater an intrusion on the premises and Defendants' privacy than the entry of the officers conducting the protective sweep. The Court thus agrees with the Government that the ATF agents' access to the premises was not prejudicial. *United States v. Johnson*, 9 F.3d 506, 510 (6th Cir. 1993); *United States v. Valles-Valencia*, 811 F.2d 1232, 1237, *amended on other grounds*, 823 F.2d 381 (9th Cir. 1987).

Under the "collective-knowledge doctrine", one officer's personal knowledge of the facts which give rise to a reasonable suspicion can be imputed to others who rely on it in working the case. *See United States v. Ibarra–Sanchez*, 199 F.3d 753, 759–60 (5th Cir. 1999). The fact that numerous agents and officers had already viewed the scene in conjunction with the protective sweep, confronted with the same factual basis for probable cause to obtain the search warrant, defeats any claim of prejudice from another agent viewing the same scene and actually handling the paperwork. There was no evidence that Special Agent Garner's entry on the premises achieved anything more than efficiency in his ability to articulate the collectively known circumstances in order to obtain the search warrant in an expeditious manner.

Additionally, the Court finds that the law enforcement officers in good faith reasonably believed that the search warrant was obtained by lawful means, with probable cause, and that the magistrate had a substantial basis for finding probable cause. *United*

*States v. Cherna*, 184 F.3d 403, 407 (5th Cir. 1999). The Defendants' Motions to Suppress predicated on the entry of ATF agents that viewed the scene after the protective sweep was concluded is DENIED.

### C. The Information Provided by Ashley Yarbrough Was Lawfully Obtained.

Defendants assert that Ashley Yarbrough was "under arrest" at the time she was interrogated and that she was not read her *Miranda* rights. Despite the defense's best efforts to impeach or contradict Agent Waters' testimony, the Court finds that Agent Waters did, in fact, read Ashley Yarbrough her *Miranda* rights and that she acknowledged understanding them.

Furthermore, under the totality of the circumstances test, the Government has satisfied its burden of proof to demonstrate that the statements that she made to the agents and officers were voluntary as that term is used in 18 U.S.C. § 3501; *Malloy v. Hogan*, 378 U.S. 1, 7 (1964); *United States v. Raymer*, 876 F.2d 383, 386 (5th Cir. 1989). She spoke to the investigators and cooperated when it suited her and, when it did not, she quit cooperating. There is no evidence to suggest that her statements were coerced. And she exercised her right to deny their requests for consent to search the house.

According to Ashley Yarbrough, she had been detained for about four hours (from about 6:30 to 9:00 p.m.) prior to her interview. D.E. 114, p. 112. She was first handcuffed behind her back for ten minutes. She was then seated on the ground and the handcuffs were removed, placed in front of her, and attached to a chain around her waist. D.E. 114, pp. 105-06. She also testified that she was put in leg irons. *Id*. She initially

answered basic questions about her identity and the residents of the house. D.E. 114, p. 111. When asked for consent to search, she refused to grant consent. *Id.*

She testified that Agent Waters later led her to a more isolated part of the backyard and asked more questions. D.E. 114, p. 114. Afterward, she was returned to her seated position. D.E. 114, p. 116. When she asked to use the restroom, the officers arranged for her to go. *Id.* Later, she was moved to a car in the front of the house where she made herself comfortable and went to sleep. D.E. 114, pp. 121-22. She was not interviewed again. *Id.* Nothing about these facts would support a conclusion that she was coerced or tricked into providing the information that she did give.

Because the house was full of weapons, the people had to be detained outside. The nature of the scene was not such that law enforcement personnel could safely allow those who were detained to go back in the house without escort or go free until the search warrant had been obtained and executed and all evidence seized. Under the totality of the circumstances, Ashley Yarbrough spoke to law enforcement officers voluntarily, after having her *Miranda* rights read to her and acknowledging her understanding of those rights.

## CONCLUSION

For the reasons stated above Defendant Michael Yarbrough's Motion to Suppress Evidence (D.E. 73) is DENIED and Defendant Ashley Nicole Yarbrough's Motion to Suppress Evidence (D.E. 81, 82) is DENIED.

ORDERED this 8th day of January, 2013.

_____
NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE